IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PEARL HATLEY, *o/b/o* L.C. | ) ) ) | CASE NO. 1:13-CV-1189 |
| Plaintiff, | ) ) | |
| v. | ) ) ) | MAGISTRATE JUDGE KENNETH S. McHARGH |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) | MEMORANDUM OPINION & ORDER |
| Defendant. | ) ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 11). The issue before the undersigned is whether the final decision of the Commissioner of Social Security (the "Commissioner") denying Pearl Hatley's ("Plaintiff" or "Hatley") application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.*, on behalf of L.C., is supported by substantial evidence and therefore, conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and REMANDS the case back to the Social Security Administration.

## I. INTRODUCTION & PROCEDURAL HISTORY

On March 11, 2010, Plaintiff applied for Supplemental Security Income benefits on behalf of L.C. (Tr. 174). Plaintiff alleged L.C. became disabled on March 1, 2008, due to suffering from attention deficit hyperactivity disorder ("ADHD") and low cognitive abilities. (Tr. 234). The Social Security Administration denied Plaintiff's application initially and upon reconsideration. (Tr. 118-20, 128-30). Thereafter, Hatley requested and was granted a hearing before an administrative law judge ("ALJ") to contest the denial of the application for benefits. (Tr. 135, 137).

1

On January 23, 2012, Administrative Law Judge Valencia Jarvis convened a hearing to evaluate the application. (Tr. 58-94).  Plaintiff and L.C., along with counsel, appeared before the ALJ and testified. (*Id.*).  On March 2, 2012, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 11-23).

Subsequently, Plaintiff sought review of the ALJ's decision from the Appeals Council. (Tr. 7).  The Appeals Council denied Plaintiff's request, thereby making the ALJ's March 2, 2012 decision the final decision of the Commissioner. (Tr. 1-3).  Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

### III.  EVIDENCE

#### A.  Personal background information

L.C. was born on November 15, 1997, making him 14 years old and in the eighth grade at the time of the ALJ's determination. (Tr. 62-63, 174).  Accordingly, L.C. was an "adolescent" when the ALJ rendered her decision. *See* 20 C.F.R. 416.926a(g)(2)(iv)-(v).

#### B.  Educational evidence

In 2008, when L.C. was in the fourth grade, he qualified for an individualized education program ("IEP").  As part of the evaluation for the IEP, Gail Porter, the school psychologist, administered the Wechsler Intelligence Scale for Children (WISC-IV), testing L.C.'s cognitive ability. (Tr. 365, 439).  L.C.'s overall score of 72 demonstrated that he was in the borderline range of intellectual functioning. (*Id.*).  The Woodcock-Johnson III Test of Achievement showed an overall low average rate of achievement. (Tr. 365, 439).  The Conner's Rating Scale indicated that L.C. exhibited characteristics of a child who had been diagnosed with ADHD, inattention hyperactive-impulse type. (Tr. 440).

In March 2010, L.C.'s IEP team performed an annual review. L.C. was in the sixth grade and in general education classes, but receiving help from the special education department as needed. (Tr. 356). It was recommended that L.C. receive special accommodations in reading, writing, math, science, and social studies. (Tr. 362). These accommodations were small group work, extra time, frequent breaks, having test questions and answers read aloud, and the use of a calculator. (*Id.*).

On April 14, 2010, Mr. Mason, a special education case manager at L.C.'s school, completed a School Activities Questionnaire. (Tr. 376-77). At the time, he had known L.C. for two years. (Tr. 376). L.C. was in the sixth grade,[1] but performed at the second grade level in reading and writing; the third grade level in math; and the fourth grade level in communication. Mr. Mason noted that L.C.'s Conner's Rating was clinically significant for attention and concentration. L.C. was unable to work independently without teacher supervision and his ability to respond to change in routine was poor. L.C. had to be given criticism on an individual, not a group level, and his ability to progress in learning skills involving reading, writing, and math was limited. (*Id.*). Mr. Mason explained that L.C. had been on suspension for seven or eight days due to behavior and disciplinary issues. (Tr. 376). However, L.C. was able to get along with peers and teachers. (*Id.*).

On May 5, 2010, Mr. Mason completed a Teacher Questionnaire, describing the child's overall functioning. (Tr. 181-90).[2] Mr. Mason explained that he saw L.C. daily to work on math, science, social studies, or language arts. (*Id.*). In the domain of acquiring and using information, Mr. Mason indicated that L.C. displayed a "very serious problem" in a number of skills. (Tr.

---

[1] On the form, Mr. Mason incorrectly stated that L.C. was in the seventh grade. (Tr. 181). L.C. was in the sixth grade at the time Mr. Mason completed the questionnaire. (Tr. 181).
[2] The form includes a rating key for the child's functioning, which ranges from "no problem," "a slight problem," an "obvious problem," a "serious problem," to "a very serious problem." (Tr. 182).

182). He explained that L.C. required extended time, credit for work attempted, constant reinforcement of material, and constant task reinforcement. (*Id.*). For attending and completing tasks, Mr. Mason indicated that L.C. had a "very serious problem" in nearly all thirteen task areas. (Tr. 183). Mr. Mason wrote that L.C. "has serious problems with starting and finishing tasks, organizing material, and cannot do multi-step directions." (*Id.*). As to interacting and relating with others, Mr. Mason identified slight to very serious problems, explaining that L.C. had special seating and a behavioral plan. (Tr. 184). L.C. had also been suspended for harassing others and inappropriate conduct. (*Id.*). Finally, Mr. Mason identified mostly "serious problems" in the domain of caring for self. (Tr. 186).

L.C.'s second quarter report card for the 2010-2011 school year showed final grades of mostly Cs and Ds. (Tr. 419). In English, gym, math, science, and social studies, teacher comments indicated that L.C. failed to turn in assignments. In character education and computer science, teachers commented on L.C.'s lack of focus. (*Id.*).

In a December 2010 special education progress report, Mallory Mamone, L.C.'s intervention specialist, reported that L.C. was showing improvement in reading and math skills. (Tr. 421). She also reported that L.C. was "a bright student who has the ability to do very well in his academics." L.C. worked with an intervention specialist on reading, math, organization, and turning in work in a timely manner. According to Ms. Mamone, L.C. had demonstrated that he could comprehend what he read by accurately answering comprehension questions. (*Id.*).

Around March 2011 an annual review of L.C.'s IEP was conducted, and at the time L.C. was in the seventh grade. (Tr. 498). The report indicated that L.C. had recently taken the TONI-4 test, which measured intelligence, aptitude, abstract reasoning, and problem solving. (Tr. 499). L.C. scored in the average range and did well when he did not have to use language when

4

problem solving. (*Id.*). L.C.'s school psychologist, Elizabeth Donovan, indicated that L.C.'s ADHD caused him to be frequently distracted, slow to begin required tasks, and unfocused. Ms. Donovan also indicated that L.C. required assistance in school with directions read aloud to him, frequent redirection, and minimal distractions. (*Id.*).

In September 2011, Ms. Mamone completed a School Activities Questionnaire. (Tr. 491-92). She had known L.C. for almost 2 years. (Tr. 491). L.C. was in the eighth grade, but Ms. Mamone opined that L.C. functioned at the sixth grade level academically, and she recounted L.C.'s special accommodations for academics and testing. When compared to his classmates, L.C. functioned "below average" in attention and concentration; following instructions; working independently; understanding and completing assignments on time; responding to changes in routine and criticism; and learning skills in reading, writing, and math. (*Id.*). Ms. Mamone indicated that L.C. had been in physical and verbal altercations for which he received detentions, suspensions, and referrals. (Tr. 492). He was able to get along with teachers, unless he felt treated unfairly, and peers unless he felt threatened. (*Id.*).

In September 2011, Ms. Mamone completed a functional equivalency questionnaire. (Tr. 494-97). She opined that L.C. had marked limitations in the domains of acquiring and using information, and interacting and relating with others. L.C. had an extreme limitation in attending and completing tasks. Ms. Mamone identified no limitations in the remaining domains.

**C. Medical evidence and state agency opinions**

In April 2008, the dean of students at L.C.'s school made a referral for in-school counseling through Beech Brook Center. (Tr. 316). L.C. was referred due to academic problems, attention-seeking behaviors, defiant behaviors, hyperactivity, poor concentration, poor peer relations, depressed moods, and bullying. (Tr. 327). Cathy Foytik, LSW, BB, conducted a

5

mental status examination, which revealed L.C. had impaired hygiene and interpersonal boundaries, a sad mood and flat affect, and impaired concentration. (Tr. 325-26). Otherwise, the examination was unremarkable. Ms. Foytik diagnosed oppositional defiant disorder and a learning disorder. (Tr. 328). She assigned a current Global Assessment of Functioning ("GAF") score of 64, representing mild symptoms, and highest GAF score of 81, indicating absent or minimal symptoms. (*Id.*). Ms. Foytik recommended weekly therapy and meeting with a psychiatrist to assess whether medication was appropriate. (Tr. 328, 332).

In a February 2010 Beech Brook review, it was noted that L.C. had made progress, but continued to have difficulty controlling his impulses in the classroom, tending to act out when he had trouble with the material. (Tr. 336). L.C. kept his anger in check, but struggled with understanding the difference between kidding around with peers and bullying. L.C. had improved in using verbalization instead of attention seeking behaviors and practicing appropriate social skills. (Tr. 337). During a February 2010 session, L.C. reported that he was paying attention more in class and completing more work with Mr. Mason, because his mother had taken away video games due to poor grades, and he wished to earn them back. (Tr. 340). L.C. also reported that to avoid distractions at school, he ignored peers during class and waited until lunch to talk. At home, L.C.'s mother kept him on a routine and he could follow it better, particularly because he had privileges taken away. As a result, L.C. felt more likely to complete homework, have his mom check it, and study better. L.C. wanted to continue to work on keeping impulses in check, especially when peers bothered him, and controlling himself in the classroom. (*Id.*).

L.C. also received psychological care from Signature Health. On March 11, 2010, L.C. underwent a psychological assessment performed by Gail Nevels, LISW. (Tr. 404-10). Ms.

Nevels noted that L.C. was 12 years old and had difficulty learning since age 5, with an "overall ability score" in the borderline range. (Tr. 404). In a March 27, 2010 session with Ms. Nevels, L.C.'s affect was pleasant, but became depressed when discussing his father, who had been emotionally abusive. (Tr. 405, 406).

During an April 2010 review, Beech Brook staff explained that L.C. showed progress in the classroom and interacting with peers. (Tr. 398). L.C. had been suspended for acting out with a younger child, but had not behaved inappropriately since. Staff noted that the child's struggles in his relationships with his mother and father negatively affected his behavior. (Tr. 398-99).

At a June 3, 2010 session with Linda Gross, M.D., it was noted that L.C. became upset and angry when he felt rejected by his father, and took his anger out on the rest of the family. (Tr. 407). A mental status examination showed that L.C. was appropriately dressed and had good eye contact. (Tr. 409). L.C.'s mood was "close to euthymic," and although he was brief in his answers to questions, they were direct and appropriate. L.C. was able to perform serial subtractions accurately, but somewhat slowly. Dr. Gross explained that although L.C. did well with screening tests, the child appeared to have cognitive difficulties and had tested at the borderline range of intelligence. She also indicated that L.C. seemed to have significant ADHD symptoms, although he was not hyperactive during the session, and some depressive symptoms. Due to reports from L.C.'s mother that the child suffered from early onset Alzheimer's and migraines, Dr. Gross requested additional medical records. (Tr. 409). She also wished to see school and therapy records from Beech Brook, and recommended another session after further evaluation. (Tr. 409-10).

When L.C. returned to Dr. Gross on June 24, 2010, he "was all smiles." (Tr. 411). L.C. reported he was living with his father for the summer and was not feeling depressed. Plaintiff

7

reported that L.C. was no longer aggressive when he visited with her. During a mental status examination, L.C. was happy, denied symptoms of depression, and was not hyperactive. Dr. Gross was concerned that L.C.'s father may reject him at some point, but at the moment the child seemed to be doing well. Dr. Gross opined that based on teacher reports, L.C. may have ADHD, but she was unable to review his school records and also had not received records from L.C.'s physicians. She opined that L.C. could benefit from treatment for ADHD in the fall, but further evaluation would be needed. As a result, she recommended waiting until the fall, when she could assess how L.C. performed in school, to determine if medication was necessary. Dr. Gross saw no depression to be treated with medication. (*Id.*).

On July 3, 2010, state agency reviewing physician Mel Zwissler, Ph.D., reviewed the evidence of record. (Tr. 97-104). Dr. Zwissler opined that L.C. had some difficulty learning; however, his condition was improving and did not result in any marked limitations of his functional abilities that would render him disabled. (Tr. 104). More specifically, Dr. Zwissler found that L.C. displayed less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. (Tr. 102-03). L.C. exhibited no limitation in the domains of moving about and manipulating objects, and health and physical well-being. (Tr. 103).

On September 23, 2010, a provider from Beech Brook met with Plaintiff to discuss L.C.'s progress. (Tr. 526). Plaintiff indicated the child was living with his father, and she had not received calls from his school, so she assumed things were fine. While the provider suggested that L.C. see a psychiatrist to determine if medication would help control his inattentive symptoms, Plaintiff responded that L.C. had been evaluated and medication was not

8

recommended. Beech Brook staff informed Plaintiff that L.C. had improved and he would be considered for discharge by his next review. (*Id.*).

The same day, Beech Brook staff also completed a report reviewing L.C.'s progress since April 2010. (Tr. 453-57). L.C. had gotten into trouble before the end of the prior school year with another student while riding the bus, but was more aware of his behaviors. (Tr. 454). L.C. was happy at his father's house and doing well at school. Teachers commented that L.C. had difficulty staying on task and needed to be redirected. Nonetheless, Beech Brook staff concluded that L.C. had been able to keep his behaviors under control, speak to therapists about things that bothered him, and express his feelings in healthy ways. L.C. had also be able to minimize his peer conflicts, verbalize incidents where he walked away rather than engage in conflict, and improve how he handled himself with his peers, which allowed him to function at school and in the community. Overall, L.C. was proving he could maintain his behaviors and simply needed to keep his attention in the mainstream classroom on track. As a result of the improvement, L.C.'s sessions were reduced. (*Id.*).

In November 2010, state agency reviewing physician Karen Terry, Ph.D., reviewed an updated version of the record. (Tr. 110-12). She opined that L.C. had some difficulty learning, but he was able to perform his classwork and could be redirected when he was off task. (Tr. 112). He was also able to perform his daily activities and his behavior had improved. Dr. Terry affirmed Dr. Zwissler's findings. (*Id.*).

On February 1, 2011, L.C. was discharged from Beech Brook because he had met treatment goals. (Tr. 458). Providers noted that L.C. had "improved greatly" during his treatment." (Tr. 459). L.C. was able to think before acting, allowing him to avoid conflict with peers, and L.C. was more likely to stay out of conflict than to engage in it. The child could

9

function well at both home and school. L.C. never attended pharmacological management. (*Id.*). In school, L.C. had become more respectful and decreased negative attention seeking behaviors. (Tr. 515). Additionally, L.C. was able to make and keep friendships. (*Id.*). It was recommended that L.C. become involved in team sports or other community activities to keep busy, and have a part time job to learn responsibility and enhance social skills. (Tr. 531).

## IV. SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on November 15, 1997. Therefore, he was a school-age child on March 11, 2010, the date the application was filed, and is currently an adolescent.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3. The claimant has the following severe impairments: ADHD; oppositional defiant disorder; and dysthymic disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since March 11, 2010, the date the application was filed.

(Tr. 14-22) (internal citations omitted).

## V. STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the child claimant is working. If not, at step two the ALJ must decide

whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings. The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings. These domains include:

> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and,
> (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains. 20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

11

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record. 20 C.F.R. § 416.927. A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id*. The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## VI.     STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has

been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence. See [Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981)](). Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. [Id.]() While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial evidence, must stand. See [Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)](); [Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983)]().

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. See [Garner, 745 F.2d at 387](). However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. See [Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989)]().

### VII. ANALYSIS

According to Plaintiff, the ALJ erred in finding that L.C.'s impairments were not functionally equivalent to a listing. The ALJ concluded that L.C. suffered from less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. She found no limitations in the remaining domains.

Plaintiff challenges the ALJ's finding with respect to the three domains in which the ALJ found less than marked limitations. She provides that substantial evidence in the record supports at least a marked limitation in each of these domains. Notably, within this argument, Plaintiff emphasizes that the ALJ failed to properly consider the opinions issued by L.C.'s special

13

education case manager and intervention specialist, which, if adopted, would support a finding of functional equivalency. As will be explained further herein, this allegation of error warrants remand.

Social Security Ruling ("SSR") 06-03p explains how the Commissioner should address opinions from sources who are not "acceptable medical sources," but rather, are deemed "other sources." SSR 06-3p, 2006 WL 2329939, at *1. Among these other sources are school teachers. Id. at *1-2. Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function. Id.; see Cruse v. Comm'r Soc. Sec., 502 F.3d 532 (6th Cir. 2007). Additionally, SSR 06-3p states:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6. The Ruling also sets out factors to be considered when evaluating opinion evidence from medical sources that are not acceptable medical sources. Id. at *4-5. These factors include: how long the source has known the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, specialization, and how well the source explains the opinion. Id.

At issue here are opinions from Mr. Mason and Ms. Mamone, two "other sources." Mr. Mason served as L.C.'s special education case manager around the time the child was in the sixth grade. (Tr. 181). He interacted with L.C. for a number of hours per week. (Id.). Ms. Mamone served as L.C.'s intervention specialist. (Tr. 491). Each source completed two questionnaires

14

regarding L.C.'s functioning based on the child's conduct in a school setting over the course of approximately two years. (Tr. 181-90, 376-77, 491-93, 494-97). While Mr. Mason's reports spoke to L.C.'s functioning in the sixth grade, Ms. Mamone addressed L.C.'s abilities around his eighth grade year.

The ALJ does not have a heightened duty of articulation when addressing opinions issued by "other sources;" nevertheless, the ALJ must have "considered" those opinions. *Clark ex rel. S.R.C. v. Comm'r of Soc. Sec. Admin.*, No: 5:12-CV-1745, 2013 WL 3007154, *12 (N.D. Ohio June 11, 2013).  In L.C.'s case, the ALJ's decision fails to demonstrate that she adequately considered the opinions from Mr. Mason and Ms. Mamone.  Though the ALJ cites to one questionnaire filled out by Mr. Mason, her opinion contains no citations to Mr. Mason's second report or the reports authored by Ms. Mamone two years later.  The ALJ addressed teacher reports and questionnaires only in general terms and provided little meaningful discussion. (Tr. 16, 19).  As a result, it is not apparent that the ALJ adequately considered most of opinions at issue, if she considered them at all, in making her determination.

The nature of the relationships between these educators and L.C. warranted some further discussion of their opinions by the ALJ.  Both sources oversaw L.C. in an educational setting over a two year period.  It is clear that at least Mr. Mason interacted with L.C. each school day.  As this Court has recognized, "[t]he observations of those who interact on a day-to-day basis with the claimant, particularly in the educational setting, necessarily provide valuable insight into the claimant's capabilities and limitations." *Matos v. Comm'r of Soc. Sec.*, 320 F. Supp. 2d 613, 616 (N.D. Ohio 2004).

Both educators also provided contrary evidence showing problems related to the domains at issue that was not sufficiently addressed by the ALJ's opinion.  For example, Mr. Mason

15

documented substantial problems in the domain of acquiring and using information: L.C. required extended time, constant reinforcement of material, and constant task reinforcement. (Tr. 182-183). The ALJ's opinion did not communicate why such limitations were discounted. The ALJ did observe that Mr. Mason opined L.C. was functioning well below the sixth grade level. (Tr. 18). Yet, the ALJ's treatment of even this evidence falls short. The ALJ indicated that Mr. Mason's opinion was undermined by Plaintiff's testimony that the child's grades improved in the eighth grade. The testimony does not speak to L.C.'s functioning during the sixth grade, and, accordingly, does not sufficiently undermine the teacher's report. Furthermore, Ms. Mamone opined that in grade eight, L.C. displayed a marked limitation in this domain, which contradicts the ALJ's finding of improvement, but was unaddressed. In further regard to Ms. Mamone, the ALJ provided no specific discussion of, or reference to, her findings. Thus, it is difficult for the Court to conclude that the ALJ even considered her reports as they relate to the domains. (Tr. 494-95). The ALJ's failure to adequately consider these opinions resulted in prejudice to Plaintiff, given that an acceptance of the opinions might have resulted in a finding of disability. Accordingly, the case should be remanded for the ALJ to consider these sources and reevaluate L.C.'s limitations under the domains at issue.

  The Commissioner's argument that substantial evidence supports the ALJ's opinion fails. The government points to opinions issued by two state agency consultative reviewers. While these consultants opined that L.C. was not disabled, they did not have access to Ms. Mamone's reports when they conducted their assessments. Additionally, the Commissioner makes a number of arguments that were not articulated, directly or implicitly, by the ALJ. For example, the Commissioner describes purported inconsistencies between Ms. Mamone's reports and other evidence of record, showing that her opinion did not suffice to undermine the ALJ's domain

findings. However, the undersigned's review of the ALJ's decision is limited to consideration of the reasoning supplied by the ALJ; it is improper for the Court to affirm the ALJ's decision based upon the post hoc rationalizations submitted by the Commissioner. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009); *Martinez v. Comm'r of Soc. Sec.*, 692 F. Supp.2d 822, 826 (N.D. Ohio 2010). While it may be true that Ms. Mamone's opinions are contradicted by the record, the ALJ did not provide such an analysis. Similarly, much of the other evidence the Commissioner discussed in support of the ALJ's findings, including reports of L.C.'s conduct outside of school, problematically was not referenced by the ALJ.

On a final note, Plaintiff contends the ALJ erred in failing to consider whether the evidence supports a closed period of disability from approximately March 2010 to August 2011. Upon remand, the ALJ will have the opportunity to consider whether L.C. qualifies for such an award.

## VI. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly, the final decision of the Commissioner is REVERSED and REMANDED for further proceedings.

IT IS SO ORDERED.

s/ Kenneth S. McHargh<br>
Kenneth S. McHargh<br>
United States Magistrate Judge

Date: July 22, 2014.